IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEFFREY SCOTT BRUETTE, ET AL.    *
                                  *
        v.                        *    Civil No. JFM-00-2324
                                  *
MONTGOMERY COUNTY,                *
MARYLAND, ET AL.                  *
                                  *****

OPINION

This action is brought against Errol Birch, a detective with the Montgomery County

Police Department, and Montgomery County, Maryland.[1]  It arises out of the arrest of the two

individual plaintiffs, Jeffrey Scott Bruette and Brian Michael Kuehn, for having videotaped a

seventeen year old, J.C., performing sexual acts with their two dogs.[2]  It is undisputed that the

videotaping occurred.  However, plaintiffs contend that they learned of J.C.'s activities

inadvertently and that they made the videotape in order to have evidence in the event that J.C.

resisted efforts they intended to make to obtain counseling for him.  Plaintiffs turned the tape

---

[1]I previously dismissed claims asserted by plaintiffs against Alex Foster, an Assistant
State's Attorney for Montgomery County.  Plaintiffs themselves have voluntarily dismissed
claims they originally filed against the Montgomery County Police Department, County
Executive Douglas M. Duncan, and Donald Inman, another Montgomery County Police
Detective.  They have also voluntarily dismissed their state law claims against Montgomery
County.

[2]Prism Multimedia, Inc., a corporation owned by Bruette, is also a party plaintiff.  Bruette
and Kuehn worked for Prism, which had a consulting agreement with Hughes Network Systems,
Inc., that was terminated as a result of the events giving rise to this case.  When I refer to
"plaintiffs" in this Opinion, I am referring to the individual plaintiffs, Bruette and Kuehn.



over to authorities before any investigation of them had been undertaken, and they claim that they would not have been charged with a crime but for the fact that they are homosexual.

Plaintiffs believe they were the victims of a homophobic persecution that humiliated them, damaged their reputations, and cost them their jobs. Perhaps their belief is understandable. Plaintiffs fail to see, however, that reasonable public officials responsible for protecting the safety of minors could see the facts from a different perspective and determine that plaintiffs' actions warranted scrutiny in criminal proceedings. I have concluded that even assuming (as plaintiffs allege and Detective Birch denies) Birch was prejudiced against homosexuals, the record establishes that there was probable cause for plaintiffs' arrests and prosecution. Accordingly, defendants' motion for summary judgment will be granted. [3]

---

[3]Unfortunately, perhaps because the issues dividing the parties are emotionally charged, the relationship between plaintiffs' counsel and defense counsel has been difficult and discovery disputes extremely acrimonious. Therefore, when I perceived that although there is much about which the parties vociferously disagree, defendants might be able to file a meritorious summary judgment motion on the basis of certain undisputable facts, I ordered that discovery be terminated (except as to matters concerning communications between Birch and employees of Hughes Network). Plaintiffs believe I erred in making that ruling, and in opposing defendants' summary judgment motion, Bruette has filed a Rule 56(f) affidavit.

Bruette first asserts that he needs discovery about Montgomery County's policies, practices, and customs. If, as I find, there is no underlying constitutional violation, evidence of such policies, practices, and customs is irrelevant. Next, Bruette seeks to take further depositions to support plaintiffs' claim that Birch acted "arbitrarily, capriciously with discriminatory intent and/or with intentional disregard for Plaintiffs." I am satisfied that the existing summary judgment record is sufficient to establish that Birch did not act arbitrarily and capriciously, and Birch's subjective intent is immaterial since, by virtue of the fact that probable cause existed for plaintiffs' arrest, it cannot be said he did anything unlawful. Third, Bruette complains that his counsel have been prohibited from viewing the videotape in order to determine whether J.C. penetrated the dogs when he performed sexual acts with them. The only claim as to which plaintiffs argue that the penetration or nonpenetration of the dogs is relevant is that Birch coerced plaintiffs to "abandon" the dogs to Bruette's parents by threatening them with prosecution for animal cruelty if they did not agree to have no more contact with the dogs. In my opinion, whether or not the dogs were penetrated, Birch had reason to believe that probable cause existed

2

I.

A.

On July 29, 1999, Bruette and Kuehn walked into a Montgomery County police station

asking to make a report. Bruette informed the officer on duty that "he was having a problem

with one of his neighbors . . . [who] 'was having sex with his dog.'" The report of the duty

officer went on to say:

> That gentlemen[4] [Bruette] said he wanted to get help for the kid; either through a
> church or some kind of counselor. The gentlemen said that he had talked to the
> sister of the neighbor boy and that the gentlemen wanted to speak with their
> mother and for her to call him. The gentlemen then said that when the sister told
> the mother to call, the mother said, 'What did he want? I don't want to talk to
> him.' The sister then said to call him and she said 'No, why should I?' That is
> when the sister told the mother what was happening and the mother did not
> believe it. I asked the complainant when this had occurred and he stated February.
> I asked why he was reporting it now and he said that the family was trying to help
> the boy out and that he did not want the boy to change the story if or when he was
> confronted.

Plaintiffs subsequently gave written statements to the police that were substantially

identical to one another. Bruette's statement read as follows:[5]

> Starting in the late summer of 1998, J.C. began frequenting my home as a guest.
> Due to his troubled home life, I felt that if I could provide an alternative, positive
> environment, it would be good. I did not want him to feel he was being misled, so
> I shared the fact with him that I am living in an alternative lifestyle. This was not

---

to charge plaintiffs with animal cruelty, and his "threat" was therefore not legally actionable.

[4]I am not inserting "[sic]" after any misspellings or grammatical errors in any of the
various statements I am quoting in this opinion.

[5]I have quoted Bruette's statement verbatim with two exceptions. First, I have identified
the minor by initials rather than by his first name. Second, I have omitted one sentence that is
not legible in its entirety on the copy in the court file. From the words that are legible, it appears
that the sentence relates to a telephone call that Bruette made on J.C.'s behalf in an effort to
resolve a problem that J.C. was having at school.

3

of any concern to him. He simply stated that what I did didn't matter to him as long as it didn't involve him.

As his visits became more frequent and sometimes lasting after I had gone to bed (with him letting himself out), I felt it necessary to have a discussion with his mother . . . I explained that J.C. was spending many hours at my home watching TV and using my computer. I further explained about my lifestyle and that I had no intention of influencing J.C.'s orientation in any way. She was also told that I had an 'open door' policy and she could check on J.C. at anytime, unannounced. She appreciated the fact that I had come to speak with her and thanked me for trying to help.

J.C. continued to visit on a frequent basis. His activities included watching TV, using my computer, and walking the dogs. While it did not seem to matter at the time, I now recall that he always took the dogs to his house before their walk.

I was out of town on business during the month of August '98 and the first week of September. The dogs were boarded at the vet for that time. While boarding, I directed the vet to neuter 'Sparky,' my male shepherd. When I returned from the trip and brought the dogs home, J.C. was very upset that I had gone and had Sparky neutered. I didn't understand his concern at the time.

J.C. continued to visit sporadically over the next few months. He is very moody and my not buying him lunch or cigarettes might have angered him. In a case like that, he might not come over for a week or so. . . .

While at an electronics tradeshow in January of '99, I purchased a 'pin hole' surveillance camera. While I had no specific need or intention for it, I had just always wanted one. As my career is involved with state-of-the-art technology, I tend to purchase many gadgets. This particular camera is the raw components that would be used to manufacture what is more commonly known as a 'nannycam.'

On, as I recall, the last Friday of January, I received a business phone call at my home. J.C. was there generally playing with the dogs. The noise was distracting, so I asked him to play elsewhere. He went to the basement area where most of my gadgets and business equipment is located. A pet snake is also there. After I completed my call, I quietly approached the stairs to the basement. Sparky heard me and came running. J.C. acted startled. I was unsure why. I suspected he was messing with or possibly stealing my equipment. I then casually set up the 'nannycam' to monitor the basement area.

4

My housemate, Brian, was resting in the master bedroom where I had set up the receiver portion of the nannycam. I told J.C. I was going to stay with Brian for a bit. Almost immediately J.C. and Sparky appeared on the TV screen.

J.C. then proceeded to masturbate the male shepherd, Sparky. He then removed his pants and attempted to have Sparky mount him, sexually. Sparky was uncooperative. J.C. then laid on top of the female Golden Retriever, Abby until he ejaculated on her. He wiped her off with a paper towel and returned to the main level to watch TV.

I was unsure of how to deal with the matter. I chose to make a videotape record of similar acts he did for the next three days. I had two concerns. One, that his actions were unnatural and he needed some counseling. And two, that I need evidence that his actions were done on his own volition, without any direction.

Over those following two days I witnessed and taped his activities in the basement. This included anal sex where he was the recipient, masturbating the male (Sparky), fingering the female, rubbing his genitals on the female while in various positions, directing the male to lick his genitals, and directing the male to 'clean him up' after he ejaculated himself.

I sought the advice of a coworker as to how I should handle the matter. Her advice was to talk to him directly about it. I was unable to do this right away as I had to leave town for a funeral.

Upon my return, Brian and I sat down with J.C. to discuss the topic. I started by reminding him that I had all sorts of high tech toys. I then told him of the nannycam. I asked him if he knew what I saw that I wanted to address. He said he didn't. I continued to push him to acknowledge the matter. He simply said he didn't steal anything. I assured him that it was not that at all.

I finally said 'You, Sparky and Abby having sex in the basement?' He smirked and only said, 'Oh, that.' I talked for a few minutes about how I was not angry and that it was not a good thing to do. His only explanation was along the lines of 'I was curious what it felt like.' The conversation ended with J.C. saying 'So, can I go use the computer now?' Which he did.

J.C. only visited one time after that to look up a phone number using the computer. As we were traveling on business and personal matters frequently during the latter part of February, his not visiting could have been his decision and/or our absence. Since he stopped visiting, I felt the problem was history. I wanted to help get him counseling, but didn't really know how. I basically let the matter be history.

When pursuing volunteer work, in the M.C. Guide Program, I discussed the matter with Patricia Vasquez (sp). She discussed it with her supervisor and expressed concern for his situation. However, she could not initiate contact on the topic. She suggested that teen bestiality is frequently found in cases where the teen is being sexually abused, themself.

Today, July 29th, L.C. (J.C.'s sister), stopped by wanting a ride to a friends. I asked her if J.C. had ever been sexually abused. She said no, but thought he had been acting 'weird' lately. She detected I was asking for a reason and pushed for me to tell her. I told her the story as it happened. I asked her to have her mom call me. Also, she told me of a counselor, 'Bruce' with Guide that she speaks with. I called Bruce and told him the problem this afternoon. He said he would like L.C. to call him so he could see how he might help.

L.C. returned to my house this evening and explained that her mother insisted that she tell her why I wanted her to call me. Apparently, J.C.'s mom, dad, and J.C. discussed it. J.C. denied it had happened and said I was making the story up.

I realize that this whole matter had reached a boiling point, so to speak. I chose to file a report and submit the videotape so that there would be a clear record of the events.

B.

The case was referred to the Pedophile Unit of the Family Services Division of the Montgomery County Police Department and assigned to Detective Birch. On August 2, 1999, Birch contacted Bruette and asked if he could meet with Bruette and Kuehn to ask them a few more questions regarding the incident. Plaintiffs immediately complied with this request and went to a police station where they were each separately interviewed by Birch and Donald Inman, another detective.[6] During the interviews they repeated substantially what they had said in their

---

[6]Plaintiffs assert a claim for violation of their right against self-incrimination, presumably in connection with these interviews. There is nothing in the record to suggest that plaintiffs were in custody at the time of the interviews or that their participation in the interviews was not entirely voluntary. In any event, most of the information plaintiffs provided during the interviews was repetitive of what they had said in their initial statements that unquestionably

written statements. One additional item of information that Bruette added was that he had briefly

shown the videotape to one of plaintiffs' friends, Danny Culbertson, when they were seeking

advice as to what to do.

Birch also asked them about their homosexuality, their relationship with one another, and

Bruette's relationship with J.C. At one point, according to Bruette's answers to interrogatories,

the following exchange occurred:

> Birch then asked 'Have you f[-----] J.C.?' I reacted to this in a startled way
> with an emphatic 'No!' Birch, with a sarcastic tone, 'You sure changed
> your tone of voice on that. You seem defensive.' I replied, 'You have
> changed your line of questioning. I thought you wanted to know about J.C.
> And now you are trying to turn this on me and I had no interest in J.C. in
> any way other than trying to help him.' I then asked 'Can I ask you a
> question?' to which Birch replied 'What's that?' I asked, 'With the kind of
> questions you are going into now, do I need an attorney?' Birch replied,
> 'Not unless you did something wrong,' Inman interjected for the first time
> during the interrogation, 'Let me answer you this way; We aren't attorneys
> and we can't give legal advice. But you are a smart man and I'll bet that
> later on today you'll know if you need an attorney or not.'

After the interviews were concluded, Bruette told Birch that he thought that "somehow

this situation is getting totally misconstrued." When asked by Birch what he meant, Bruette went

on to say, "It seems to me you are trying to run me up the flagpole for something when the real

focus should be on dealing with J.C.'s issues." Bruette then said, in response to a request by

Birch for further clarification, that he felt Birch was trying to arrest him for something and that all

that would do would be to ruin his reputation and embarrass J.C.

---

were voluntary. Indeed, plaintiffs' complaint is not that Birch used anything they said in the
interviews against them but that he failed to follow up on leads they gave to him.

Birch thereafter interviewed or requested interviews of some (but not all) persons

identified by plaintiffs as having knowledge about the incident, including J.C., J.C.'s mother,

J.C.'s sister, Danny Culbertson, and Patricia Vasquez.  Other than Birch's declaration of what J.C.

said to him, the summary judgment record does not reflect what Birch was told during these

interviews.

C.

On August 11, 1999, Birch filed a statement of charges against Bruette and Kuehn for

child abuse by a custodian, possession of child pornography, filming a child during a sex act,

distributing and promoting child pornography, and contributing to the condition of a child.  The

statement of charges against Bruette (which was substantially the same as the statement of charges

against Kuehn) read as follows:

> On 7-29-99, Jeffrey Bruette (DOB 12-24-61), responded to the Montgomery
> County Police Station-Germantown District and advised Officer Franklin Graves
> that he video taped J.C. (DOB . . .), engaging in sexual acts with his two (2) dogs
> at his residence located at 13500 Ansel Terrace Germantown, MD 20874.
>
> On 8-02-99 your affiant interviewed Jeffrey Bruette at youth division and he
> described J.C. as a friend from the neighborhood.  Jeffrey Bruette advised that J.C.
> started coming by his residence to visit his dogs, watch his television and to play
> on his computer.  Jeffrey Bruette advised he went to J.C.'s mother . . . and advised
> her that he was homosexual and his partner also resided at the residence.  Jeffrey
> Bruette advised J.C.'s mother gave J.C. permission to continue to visit his
> residence.  Jeffrey Bruette advised your affiant that he believed he had some
> responsibility for J.C. while he visited his residence.
>
> Jeffrey Bruette advised between January 01, 1999 and February 28, 1999 he was
> concerned that J.C. was stealing his property from the basement of his residence.
> Jeffrey Bruette advised he set up a hidden camera hooked up to a monitor in his
> bedroom.  Jeffrey Bruette advised he and his roommate Brian Kuean observed J.C.
> having sex with his two dogs.  Jeffrey Bruette advised that when J.C. left his
> residence he connected his VCR to the monitor.  Jeffrey Bruette advised later that
> evening when J.C. returned to his residence he went to his bedroom and turned on

8

the monitor and VCR. Jeffrey Bruette advised he and Brian Kuean observed J.C. engaging in sex with his dogs (German Shepherd, Golden Retriever). Jeffrey Bruette advised that over a period of two to three days J.C. visited his residence on several occasions. Jeffrey Bruette advised each time J.C. visited his residence he would go to the basement and have sex with his dogs. Jeffrey Bruette admitted that he and Brian Kuean monitored him having sex with the dogs and video taped it. Jeffrey Bruette admitted that he told a friend about J.C. having sex with his dogs and allowed him to watch the tape.

On 8-3-99 your affiant interviewed J.C. and he admitted that when he went to Jeffrey Bruette's residence he had sex with his two dogs. J.C. advised he had sex with the dogs because he wanted to know what it was like to be homosexual.

Early in the morning on August 16 plaintiffs voluntarily surrendered to the Montgomery County police. Because of what they allege to have been a delay in processing, they were held until after the bail bondsman had closed for the evening, and they spent the night in jail.[7] Approximately four months later, on December 6, 1999, after extended plea negotiations, Bruette pled guilty to the charge of contributing to the condition of a minor and was sentenced to

---

[7]A search warrant for plaintiffs' residence was obtained while they were being held. Plaintiffs make several contentions in regard to the search warrant, none of which have merit. First, it was not, as plaintiffs claim, a denial of the constitutional right of assistance of counsel for them to be served with the warrant outside the presence of their counsel. Second, although a television set that was seized apparently was lost while it was in the police department's custody, plaintiffs have stated no constitutional claim in regard to it. Indeed, Bruette indicates in his answers to interrogatories that when he met with Birch to retrieve his seized property, Birch explained that he could "file a claim [for the television] with the county's insurance company, and they'll reimburse you." Third, various other items that plaintiffs contend were wrongfully seized and held, including magazines and photographs, are within the jurisdiction of the Juvenile Court for Montgomery County to which an application for return can be made.

I also note that although the videotape was not seized during the search but turned over by plaintiffs to the police voluntarily, plaintiffs are seeking its return as well, contending that it is not contraband. This request is surprising since plaintiffs' asserted reason for making and retaining the videotape in the first place – to help J.C. obtain counseling – has now been overtaken by events. In any event, if plaintiffs are seeking the return of the videotape, they may file an appropriate application with the Montgomery County Juvenile Court, which has custody of it.

probation.[8]  The other charges against him were <u>nolle prossed</u>.  Kuehn entered into a plea

agreement whereunder he agreed to perform community service in exchange for a <u>nolle prosequi</u>

on all the charges against him.

II.

On the basis of the facts I have delineated, plaintiffs assert a multitude of federal and state

claims, including ones for unlawful arrest, malicious prosecution, and denial of due process and

equal protection of the laws.[9]  As I have previously indicated, these claims all fail because

---

[8]After Bruette had successfully complied with the conditions of his probation, the Circuit Court granted him probation before judgment.  The court had declined to do so, however, in the first instance.

[9]Plaintiffs' complaint has eleven counts.  However, in their opposition memorandum, plaintiffs state that the complaint "contains 50-55 separate claims, depending upon how they are counted."  Plaintiffs go on to chastise defendants for making only 20 to 30 summary judgment motion arguments.  If criticism is appropriate, it is plaintiffs themselves who are its proper focus since it is not a commendable practice to assert claims in such an imprecise manner that even their authors cannot specify their number.

I will not address every particular of the various claims that plaintiffs make since the claims can be resolved on the basis of principles applicable to all of them.  I note, however, that plaintiffs' claim under the Eighth Amendment fails on two grounds. First, plaintiffs cite no authority to support the proposition that what they claim to be cruel and unusual punishment – Birch's contact with their employer and his advising them that he would charge them with the crime of animal cruelty if they did not give up their dogs – is of constitutional import.  Second, both of those actions occurred before plaintiffs were convicted of any crime, and the Eighth Amendment applies only "after conviction and sentence."  <u>Graham v. Connor</u>, 490 U.S. 386, 392 n.6 (1989).

Plaintiffs' claim under the First Amendment (and a comparable provision of the Maryland Constitution) is likewise facially deficient.  As articulated by plaintiffs, the videotape was constitutionally protected expression because they made it for the purpose of showing it to "a counseling or legal authority" and it thus was "itself a statement: 'J.C. is committing bestiality.'"  Therefore, according to plaintiffs, Birch violated their constitutional rights "by punishing them for making that statement."  Creative though this argument may be, a law enforcement officer clearly cannot be held civilly liable for having failed to anticipate it.

probable cause existed for plaintiffs' arrest and prosecution.[10]

Md. Code Ann. art. 27, § 419A, provides that any person who photographs or films a minor under 18 years of age engaging in an obscene act or engaging in sexual conduct is guilty of a felony. "Sexual conduct" includes any touching or contact between human beings and animals. See Md. Code Ann. art. 27, § 416A. Plaintiffs' videotaping of J.C. performing sexual acts with their dogs clearly falls within the terms of the statute. Section 419A also prohibits the distribution or promotion of such photographs or films. Plaintiffs' showing of the videotape to their friend, Danny Culbertson, falls within that prohibition. Article 27, § 35C criminalizes sexual abuse, including unnatural and perverted sexual practices, by a person having permanent or temporary care or custody of an individual under 18. It appears that plaintiffs did have temporary care and custody of J.C. when they permitted him to stay in their basement. See Zaal v. State, 584 A.2d 119, 122 (Md. Ct. Spec. App. 1991), rev'd on other grounds, 602 A.2d 1247 (Md. 1992). Therefore, there was probable cause to believe that by knowingly permitting J.C. to engage in

---

[10]It follows a fortiori from my holding that probable cause existed for plaintiffs' arrest and prosecution that Birch had an objective basis for believing that he had not violated plaintiffs' federal constitutional rights. Thus, he would be entitled to a defense of qualified immunity under federal law. Harlow v. Fitzgerald, 457 U.S. 800, 816 (1982). "The good or evil intentions of . . . [an] official" are not relevant under that defense. Shoemaker v. Smith, 725 A.2d 549, 558 (Md. 1999). Maryland law, at least as to tort claims, is different. Even if a police officer has a reasonable belief, as measured by an objective standard, that probable cause existed for a person's arrest, nevertheless he could be held civilly liable for the arrest if probable cause did not in fact exist provided that he acted with a subjectively malicious intent. See id. at 558-59. Plaintiffs have not, however, cited any Maryland cases (and I am aware of none) supporting the proposition that a police officer (or, for that matter, anyone else) can be held liable for committing an act that was lawful e.g, , arresting someone with probable cause, simply because he allegedly had a subjectively bad intent. Indeed, the Maryland Court of Special Appeals has indicated that the existence of probable cause would preclude any state constitutional or tort claims regardless of the police officer's subjective intent. See Thacker v. City of Hyattsville, 762 A.2d 172, 184 (Md. Ct. Spec. App. 2000).

sexual activity with their dogs, plaintiffs violated this statute as well. Finally, § 3-831 of the Courts and Judicial Proceedings article of the Maryland Code renders criminally responsible any adult who wilfully contributes, encourages, causes, or tends to cause any act which results in a violation rendering a child delinquent, in need of supervision, or in need of assistance. As Bruette admitted when he pled guilty to a charge under this section, there was probable cause to believe that plaintiffs violated this statute when they permitted J.C. to engage in perverted conduct without stopping him or seeking assistance for him for many months.[11]

Although plaintiffs make several unpersuasive technical challenges to the applicability of these statutes to their conduct, the primary thrust of their argument is that they lacked criminal intent. They have cited no authority concerning what, if any, specific intent is required by Maryland law under the statutes involved. Assuming, however, that a specific intent is an element of the crimes charged, the question here is not whether plaintiffs possessed that intent but whether probable cause existed to believe they did.

The answer to that question lies in three uncontroverted facts. First, plaintiffs did not videotape J.C. committing sexual acts with their dogs once but three times. Second, plaintiffs unnecessarily displayed the tapes to Danny Culbertson, one of their friends. Third, plaintiffs never turned the tape over to any counselor and turned it over to the police five months after the

---

[11]Plaintiffs were also charged with possession of child pornography in violation of article 27, § 419B. That charge was improper since section 419B applies only to children under 16 and J.C. was 16 or older at the time of the events in question. However, there is no basis in the summary judgment record for inferring that Birch acted in bad faith in filing a statement of charges under this section. In any event, the mistake in charging plaintiffs under this section was immaterial since, if the charge had not been returned, plaintiffs nevertheless would have been arrested and prosecuted on the other charges against them.

events occurred and only after they had reason to believe that someone, particularly J.C.'s family, might complain to the police about their own conduct.

None of these facts, of course, establish that plaintiffs did possess an unlawful intent. However, if the reason plaintiffs videotaped J.C. was to confront him with his conduct, the question arises why they did not stop after having videotaped him once. Likewise, if they were simply trying to obtain assistance for J.C., there was no need for them to show the videotape to Culbertson, rather than simply describing it to him. Their own statements to the police demonstrate they were capable of portraying the events with graphic detail. Finally, although it appears from the summary judgment record that it was their own efforts to assist J.C. by inquiring into whether he had been the subject of abuse that alerted J.C.'s parents to the fact they had made the videotape, it is troubling that plaintiffs waited until they might themselves be accused of illegal conduct before turning the tape over to any responsible third party. As Bruette put it in his written statement to the police, he waited until "the matter had reached a boiling point, so to speak."

In the final analysis, the essence of plaintiffs' complaint is that Birch did not accept their word that they had acted with the intent to help J.C. However, Birch was under no requirement to accept their story. Unfortunately, experience demonstrates that people who are generally kind and gentle by nature can commit illegal acts. Further, an ambivalence in action sometimes reflects an ambivalence in intent. It was not necessarily inconsistent for plaintiffs to have videotaped J.C. both with the inchoate (and long unexecuted) intention of helping him and to satisfy a prurient

13

interest.[12] By saying this, I am not implying that plaintiffs in fact had any motivation other than to

obtain for J.C. the counseling he required. But the facts that plaintiffs videotaped J.C. and the

dogs on three separate occasions, displayed the tape unnecessarily to a friend, and delayed five

months in approaching the authorities raised serious questions that Birch could reasonably

conclude negated plaintiffs' protestations of innocence and established probable cause for their

arrest. Perhaps some might say he was overly cynical. On the other hand, a detective in a

pedophile unit cannot afford to be naive.

III.

Plaintiffs assert one final claim: that Birch violated their constitutional rights and

committed the tort of tortious interference with business relationships by communicating to

Hughes Network Systems that they had been arrested. Thereafter, Hughes terminated their

consulting agreement. Birch has testified that the only reason he contacted Hughes was to learn,

as a step in the routine investigative process in any child pornography case, whether plaintiffs had

access to computers at work.

The summary judgment record as to the reason for Birch's contact with Hughes is not fully

developed, and if this factual dispute were material, plaintiffs would be entitled to further

discovery. The existing record, however, establishes that Hughes learned of the arrest from other

sources before terminating the consulting agreement. An article about the arrest appeared in a

local newspaper, and plaintiffs themselves then told Hughes about it. Therefore, even assuming

that plaintiffs' allegation concerning the reason that Birch contacted Hughes is correct (and further

---

[12]For this reason, even if the witnesses whom Birch interviewed after taking plaintiffs'
statements confirmed that plaintiffs had expressed to them concerns about J.C., this alone would
not have dispelled the existence of probable cause.

14

assuming that he could be held liable for communicating to Hughes the fact of the arrest), there is no causal connection between Birch's call and plaintiffs' asserted damages. Hughes would have known of the arrest and terminated the consulting agreement in any event.

A separate order is being entered herewith.


Date:   March 26, 2002

_____
J. Frederick Motz
United States District Judge